1                       UNITED STATES BANKRUPTCY COURT
                         NORTHERN DISTRICT OF TEXAS
2                              DALLAS DIVISION

3

4   SUPERIOR AIR PARTS, INC.,     .  Adv. No. 09-03052-bjh
                                   .
5          PLAINTIFF               .
                                   .  Dallas, Texas
6   VS.                            .  Monday, June 22, 2009
                                   .
7   THIELERT AG,                   .
                                   .
8          DEFENDANT               .
    . . . . . . . . . . . . . . .  .
9

10  IN RE                          .
                                   .
11  SUPERIOR AIR PARTS, INC.       .  Case No. 08-36705-bjh11
                                   .
12  DEBTOR                         .
                                   .
13  . . . . . . . . . . . . . . .  .

14

15

16

17               HEARING ON MOTION FOR SUMMARY JUDGMENT
              FILED BY PLAINTIFF, SUPERIOR AIR PARTS, INC.
18            AND MOTION TO SHORTEN THE NOTICE PERIOD FOR
                  THE DEBTOR'S DISCLOSURE STATEMENT
19

20

21

22            BEFORE THE HONORABLE BARBARA J. HOUSER
                 UNITED STATES BANKRUPTCY JUDGE

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1  APPEARANCES:

2

3  For the Plaintiff,              MR. STEPHEN ROBERTS
   Superior Air Parts, Inc.       Strasburger & Price, LLP
4                                  600 Congress Ave., Suite 1600
                                   Austin, Texas  78701
5

6  For the Defendant,             MR. CHESTER B. SALOMON
   Thielert AG                    Becker, Glynn, Melamed
7                                  & Muffly LLP
                                   299 Park Avenue
8                                  New York, New York 10171

9
   For the Official Committee     MR. ELLIOT D. SCHULER
10 of Unsecured Creditors         Baker and McKenzie
                                   2300 Trammell Crow Center
11                                 2001 Ross Avenue
                                   Dallas, TX 75201
12

13 Electronic Court Reporter      MS. DAWN M. HARDEN
                                   U.S. Bankruptcy Court
14                                 1100 Commerce St.
                                   Dallas, Texas 75242
15

16 Transcription Service:         MS. DIANE LANCASTER
                                   5838 Westhaven Dr.
17                                 Fort Worth, TX  76132

18

19

20

21

22

23

24

25

 1          DALLAS, TEXAS, MONDAY, JUNE 22, 2009; 10:56 A.M.

 2                    (Chester Salomon appearing telephonically)

 3          THE COURT:  All right.  *Superior Air Parts*.

 4          MR. ROBERTS:  Your Honor, Steve Roberts for the

 5   Debtor.  I'd like to start off by apologizing by the

 6   Court.  I was indisposed for a few minutes unexpectedly.

 7          THE COURT:  No problem.  I'm sorry that you

 8   ended up --

 9          MR. ROBERTS:  It was an interesting hearing to

10   listen to.  I look forward to reading --

11          THE COURT:  -- moving up to the end of the

12   docket.

13          MR. ROBERTS:  I look forward to reading the

14   opinion.  I believe we have Mr. Chester Salomon that's on

15   the --

16          THE COURT:  He's not yet, but I'm going to patch

17   him in now.

18          MR. SCHULER:  Good morning again, Your Honor.

19   Elliot Schuler on behalf of the Unsecured Creditors

20   Committee.

21          THE COURT:  All right.  Give me just one second.

22   I know I have a number someplace.  Here we go.

23                    (Mr. Salmon is connected by telephone)

24          THE COURT:  Mr. Salomon, this is Judge Houser.

25   Are you there?

1          MR. SALOMON:  I am, Judge Houser.  Good morning.

2          THE COURT:  Good morning.  All right.  I think

3   we're ready to proceed.

4          MR. ROBERTS:  Your Honor, we have a Motion for

5   Summary Judgment in the adversary proceeding by the Debtor

6   against Thielert AG, Mr. Salomon's client.  We also have a

7   Motion to Shorten Time on their Disclosure Statement.  If

8   I may, I believe the Summary Judgment is fairly

9   straightforward, and I'd like to proceed with that first.

10         THE COURT:  That's fine.

11         MR. ROBERTS:  Your Honor, this has basically

12   come down to a Motion for Judgment on the pleadings.  It

13   is a Motion for Summary Judgment, but the Thielert AG has

14   admitted that they're their parent, that they acquired

15   their -- they filed a proof of claim alleging a secured

16   claim, and that they have not filed -- or, there is no

17   active Uniform Commercial Code on file perfecting any of

18   their liens.

19         THE COURT:  Was there a Financing Statement at

20   one time, and did it just lapse?  Is that it?

21         MR. ROBERTS:  Your Honor, that's the

22   speculation.  Mr. Salomon may know.  What we do know, that

23   in 2005, they bought the note from PNB, I believe, and

24   that the PNB transaction was done in 2002.  So, it's quite

25   possible that it expired in 2007.  The Secretary of State,

1  once they expire, doesn't show them on their record as

2  having been filed, which is news to me.  I don't think it

3  used to be that way, but that's the way that the State is

4  operating, so we're operating on that basis.  And the --

5  I'm short-circuiting it a little bit, but I know the Court

6  has read the pleadings, and I know Mr. Salomon has

7  responded briefly by saying, "Well, we might have been

8  perfected at one time."

9         I would say this, Your Honor.  Somebody may need

10  to be held by responsible by TAG in not having perfected

11  the security interest, and Mr. Salomon may not be in a

12  position to stipulate or waive any issue on collateral.

13  But I think, as a matter of law, that it's quite clear.

14  They have not alleged that they have a perfected security

15  interest in their proof of claim; have not provided any

16  evidence of it; and have not provided any evidence in

17  response to our Motion for Summary Judgment.  So, on that

18  basis, I would ask for the Court to enter Summary Judgment

19  aborting the lien under Section 544 of the Code, which

20  puts us in the position of a post-judgment lien creditor

21  and creditor who has a return of execution from the

22  Constable.

23         THE COURT:  Very well.  Mr. Salomon?

24         MR. SALOMON:  Good morning, Judge.  I think Mr.

25  Roberts has it substantially right.  There are some slight

1  differences.  I do believe, from our UCC searches, that

2  there was a security interest, a UCC filing, as

3  Mr. Roberts suggests, in 2002.  It turns out that in early

4  2006, there was a subsequent UCC Financing Statement

5  filed, just identifying of the transferee from PNC to

6  Thielert AG.  But it is -- he is correct that we have not

7  extended it, as I understand.  When I say "we have not

8  extended it," I mean that Thielert did not extend it.

9        My firm became involved in this case in

10  December 2008, January of 2009.  By that time, it appears

11  that the UCC filing had lapsed.  And what we had asked in

12  our papers, Your Honor, is that there be some

13  acknowledgement that there had been a UCC filing.  I

14  realize that it's not incumbent upon Mr. Roberts to so

15  indicate, but we think that for the completeness of the

16  record, that it should be stated.  Now, apparently, he is

17  not in a position today to acknowledge that, so we'll just

18  have to go with what the record provides.

19        We also acknowledge, Judge, that under Section

20  544, the Trustee, i.e., the Debtor-in-Possession, does

21  have certain powers to set aside a security interest that

22  is unperfected.  And as Mr. Roberts' firm has indicated in

23  its motion papers, we did, in fact, admit to an allegation

24  in the Complaint stating that there is no active UCC

25  Financing Statement on file with the Texas Secretary of

1   State perfecting the lien.  So, we understand where we are

2   here.  We are not in the position, again, as Mr. Roberts

3   has indicated, to voluntarily grant, or, rather, withdraw

4   the claim, or to acknowledge that we do not have a

5   security interest.  We await the Court's ruling on this.

6   We understand that, given the presentation of the material

7   facts, that there is very little for us to say against the

8   motion that has been made by Mr. Roberts.

9        THE COURT:  Very well.  Mr. Salomon, I

10  appreciate your candor and your comments this morning, but

11  it does appear to me that, based upon the admissions made

12  by the Defendant that there is no active UCC on file --

13  did the Committee wish to be heard on this?

14       MR. SCHULER:  Very briefly, Your Honor.

15       THE COURT:  For what purpose?  You're not a

16  party to this.

17       MR. SCHULER:  Your Honor, the Committee and the

18  Debtor and TAG have had separate discussions with regards

19  to claims that the Committee has against TAG.  And I will

20  say that we anticipate that this will be resolved in the

21  plan that ultimately gets filed.  But we've had lengthy

22  discussions with Mr. Salomon with regards to potentially

23  equitably subordinating or recharacterizing those claims.

24  And what we have proposed to both TAG and the Debtor, and

25  I believe a stipulation has been signed between all three

1 | parties, that whatever order gets entered here today will

2 | expressly provide that it will not prejudice the Committee

3 | in subsequent actions to equitably subordinate or

4 | recharacterize those claims; that TAG will not assert res

5 | judicata, or collateral estoppel, or anything along those

6 | lines.  I recognize, no, we're not a party in this

7 | lawsuit.  I just wanted to note that, and I'm not sure if

8 | Mr. Roberts was going to ultimately get that before the --

9 |      MR. ROBERTS:  Your Honor, there is a stipulation

10 | on file regarding a lack of prejudice, but I don't think

11 | it goes to the merits of the motion.

12 |      THE COURT:  All right.  Mr. Salomon, do you

13 | agree that there is such a stipulation?

14 |      MR. SALOMON:  There is a stipulation.  I think

15 | that most of what Mr. Parham says is absolutely correct,

16 | but I think that we should resort to the language of the

17 | stipulation, and not to counsel's characterization of that

18 | stipulation. So, I'm prepared to certainly live by the

19 | stipulation, which I signed last week and has now been

20 | filed with the Bankruptcy Court.

21 |      THE COURT:  Fair enough.  Then I appreciate

22 | everybody's comments and bringing that to my attention.

23 | But in the face of the admission that there is no active

24 | Uniform Commercial Code Financing Statement on file, the

25 | Court will grant the Motion for Summary Judgment as moved

1   by the Plaintiff Debtor.  Will you prepare --

2           MR. ROBERTS:  Yes, Your Honor, we will prepare

3   an order for the Court.

4           THE COURT:  Very well.

5           MR. ROBERTS:  Your Honor, the next motion is a

6   Motion to Shorten the Notice Period for the Debtor's

7   Disclosure Statement.  Because the Court has a tight

8   schedule, I'd like to use this as a brief opportunity to

9   bring the Court up to what's up to date.

10          THE COURT:  Please.

11          MR. ROBERTS:  I will tell you, what we're going

12  to ask for is about two weeks.  We do not expect to have a

13  contested Disclosure Statement.  There could be an

14  objection, but I haven't had a Disclosure State -- a

15  contested Disclosure Statement hearing in many years.

16          We filed our Disclosure Statement on May 15th,

17  which was the exclusivity deadline.  The Committee wasn't

18  on board at that point.  I would characterize it more as

19  an offer to the constituencies.  We had Thielert Aircraft

20  Engines, a sister company, with a $16 million claim.  We

21  had Thielert Aircraft TAG, who Mr. Salomon represents, who

22  is a parent and a secured creditor; and as Mr. Schuler

23  referred to, had the Committee making the allegations that

24  they believe supported recharacterization or subordination

25  of those claims.

1           The process of negotiating those has continued,

2    and at the same time, our plan had called for just a

3    straight-up auction of either the equity or the assets of

4    this Debtor to fold into a Plan of Reorganization.

5    Because this is an FAA-regulated type of entity, there is

6    some value to doing a stock purchase.  So, we set up a

7    Plan and a Disclosure Statement where we would not have a

8    stock report, whereas we would go forward through an

9    auction process, and whoever prevailed would roll right

10   into the Plan of Reorganization.

11          Since that time, the Creditors' Committee had

12   decided to adopt, and urge the Debtor to adopt, a proposal

13   by Aviation Parts Supply to be a stalking horse.  So

14   negotiations ensued.  We modified the Disclosure Statement

15   and Plan.  Aviation Parts Supply was very concerned about

16   this going into August, as are the parties, because there

17   is a $450,000 insurance premium.  While we do have a

18   considerable amount of cash, we are deteriorating, if you

19   take the combined cash, accounts receivables, and

20   inventory.

21          So, up until last Thursday -- and there have

22   been negotiations with other parties.  Up until last

23   Thursday, we had been working on a plan, a bidding

24   procedure, and some other documents relating to using APS

25   as a bidding horse.  They would buy the parts business,

1   and the engine business would be spun off.   It was a

2   fairly complicated structure that we have.   However, late

3   Thursday -- or early Thursday morning, APS withdrew their

4   offer to be a bidding horse purchaser.   At the same time,

5   I do expect to have today a term sheet for what we believe

6   is a far more favorable bidding horse bid by a company

7   called Brantley International.

8           So, what we intend to do, and we had hoped to do

9   it before I stood before you today, but I am going to need

10  another 24 hours, that we will not make any material

11  modifications to our Disclosure Statement after tomorrow,

12  except perhaps in a response to objections, so that

13  parties will know exactly what Disclosure Statement --

14  what modifications have been made.   We may very well have

15  a stalking horse plan tomorrow, but we will still have a

16  bidding process.

17          So what we will be filing by the end of tomorrow

18  is the modifications which resolve differences between TAG

19  and the Committee, which is a major development in this

20  case, and tentatively also with TAE and the Committee.

21  So, we may have that piece locked down.   In fact, I am

22  optimistic we will.   We may have a stalking horse, and

23  then we are also going to call for an auction process to

24  give everybody one last chance to bid.

25          Everybody that we talked to, despite our lengthy

1  negotiations and trying to move quickly, continued to tell

2  us that July 31 is not just a "we wish we could get this

3  done" date, but an extremely critical date.

4          With that in mind, we would ask the Court to

5  allow us to have a Disclosure Statement hearing the week

6  of July 6.  I believe you may be out, Your Honor.  I don't

7  know.  But again, we don't consider that to be

8  controversial.  I would also advise the Court that

9  tomorrow we will be filing the bid procedure motion, which

10  we have had to hold off until we knew whether we had a

11  bidding horse, a break-up fee, and would ask that that be

12  set at the same time, and that we will ask when we file

13  that motion.

14          THE COURT:  Bid procedures set at the same time

15  as the Disclosure Statement?

16          MR. ROBERTS:  Yes.  The approval, either that or

17  earlier; and I'll advise you when we file that.

18          THE COURT:  The problem you're going to run into

19  is, I don't believe there will be a judge in the district,

20  a bankruptcy judge in the district the week of July 6th.

21  There is a --

22          MR. ROBERTS:  If the Judge would shorten it even

23  further, we'd go for July 2nd.  I will tell you, there's

24  about 65 parties in this case on our mailing list, and

25  virtually all of them are involved in this process or

1   represented in this process.  Large creditors, of course,

2   I think of our seven largest creditors, that takes care of

3   -- I won't give you statistics on claims.  It's a fairly

4   small case.

5          THE COURT:  Well, I'm here the 6th, but I've got

6   a full docket, and there is an education program for

7   bankruptcy judges that is the balance of the week, the

8   week of the 6th.  So, you can imagine how all of our

9   dockets are the day before each of us is likely leaving,

10  and I think all the judges are in attendance at that.  So,

11  I don't know if we'll be able to accommodate that or not,

12  Mr. Roberts, but I will be happy to check and see what we

13  might be able to do.

14         MR. ROBERTS:  We're also, as you might imagine

15  -- again, I hate to stand here telling you about things I

16  haven't filed, but we have three draft plans in process

17  waiting for the right direction to go, and I think that

18  really is happening.  The -- I think it's not appropriate

19  now, but we obviously will be filing a Motion to Shorten

20  Time between the Disclosure Statement and the Plan.

21  However, we do want to give parties -- they need to have a

22  sufficient time to vote, because we're all ready.  If we

23  try to get this done by August 1, we're going to need to

24  be shortening there, and that's just --

25         THE COURT:  You're going to -- I will tell you

1  that, in nine and a half years, I have never shortened the

2  time for voting on a plan.  So everybody just needs to

3  understand that I think that's extraordinary relief, and,

4  so, I'm not prejudging your request, but --

5          MR. ROBERTS:  I appreciate your candor, Your

6  Honor.  Again, I don't know what your history or

7  predisposition on a disclosure statement is, but it

8  doesn't take someone long to read one or respond to one.

9          THE COURT:  No, I'm --

10         MR. ROBERTS:  So, if we could get that -- if

11 there's any way to get that heard before the July 4th

12 weekend, we could hit the 25-day notice requirement for

13 the plan and be back in Court by the end of July.  Of

14 course --

15         THE COURT:  But, again, at this point, we don't

16 have any documents on file that you want to go forward

17 with.  Is that fair?

18         MR. ROBERTS:  Yes, we have the Disclosure

19 Statement.  We have the Disclosure Statement, was on file

20 as of May 15th, which can be set today.  I am just

21 advising the Court that --

22         THE COURT:  Well, but it --

23         MR. ROBERTS:  -- there will be material

24 modifications to it.

25         THE COURT:  But --

1          MR. ROBERTS:  But it's still a bidding process,

2     still a sale.

3          THE COURT:  Well, but it's -- I mean, I'm

4     struggling that I'm going to set a May 15th Disclosure

5     Statement that you're telling me is not the right one.

6          MR. ROBERTS:  It's -- there are material

7     modifications to it.  It's still -- what parties were

8     given notice of on May 15th when we mailed that out is, we

9     don't have a bid yet.  We're going to sell either the

10    engines, or the parts, or both.  It's going to be an asset

11    sale, it's going to -- or a sale of equity, and we're

12    going to do it by auction.  It also had treatment,

13    suggested treatment as between TAG and the creditors,

14    which has now, since that was the -- to put it in

15    perspective, that was basically TAG's offer to the

16    Committee.  So, that offer has been improved and agreed

17    upon.  So, just to give you a sense of the difference

18    between what the parties are reading.

19          And then the third thing, it may be, and instead

20    of not having a stalking horse, if nobody else shows up,

21    here's the plan, where we've got, you know, $7 million,

22    assumption of all the purchase orders, ongoing business.

23    We might actually hit a home run in this case.  So are all

24    the material modifications.  And I agree with that.

25    That's why my comment is, it doesn't take very long in

1   this case for the parties that have been following it to

2   understand the modifications that I just sketched for the

3   Court orally.

4        So, you know, I'm back to asking for a hearing

5   on my existing Disclosure Statement, and if, say, the

6   modifications are too material and someone wants more time

7   and thinks it's unfair, I'm sure they would be quite

8   capable of raising that issue.

9        THE COURT:  Well, but the problem is, is I'm not

10   worried about the Committee, who has been involved in the

11   negotiations.  I'm worried about the other parties in

12   interest who haven't been involved in the discussions.

13        MR. ROBERTS:  And, Your Honor, I wasn't

14   referring to the Committee.  I was referring to the other

15   parties, if somebody gets notice of the modified plan and

16   has a chance to do so, yes.

17        THE COURT:  Well, but, I mean, let's just be

18   realistic.  The earliest you're going to file something is

19   tomorrow afternoon.

20        MR. ROBERTS:  It could be today, but I'm not

21   going to promise that to the Court.

22        THE COURT:  Right.  So, you're going to file it

23   tomorrow, which is June 23rd.  Even if you mail it out on

24   the 23rd, I don't know where your creditors are.  I

25   haven't looked at a matrix lately.  But it's going to take

1 two or three days for non-ECF parties who filed

2 appearances in the case to get it, which means that people

3 will be lucky to have it by the 26th.  And you want me to

4 have a hearing either July 6th, or, frankly, if I can't

5 fit you in there, you want it to be the week of the 29th,

6 so that people would have less than a week to get the

7 document, read it, and then object, that's --

8          MR. ROBERTS:  You know, it is short, and I will

9 tell you, this plan is endorsed by the Creditors'

10 Committee, and I didn't say that.

11          THE COURT:  No, I --

12          MR. ROBERTS:  This was a Debtor's plan, and I do

13 know that's short.  But I would -- and I'm a bit

14 handicapped by not having it in front of me to explain to

15 the Court why the July drop-dead date has become important

16 to these bidders that have come to us.  If I were given a

17 disclosure statement and I had a week's hearing, I would

18 have to read the disclosure statement, and I would have to

19 decide whether I think that's adequate disclosure and file

20 a response.  That's a whole different process than trying

21 to advise my client whether they should have to vote on a

22 plan, whether -- I just don't think this case is that

23 complicated for someone to be able to review and respond

24 to the disclosure statement.

25          THE COURT:  Well, what is the urgency?  Why is

1    July 31st such a magic date?

2         MR. ROBERTS:   The -- we pay quarterly insurance

3    premiums, and the quarterly insurance premiums due in

4    August are $450,000.  This is a -- the proposal that we --

5    if we have a stalking horse, it will essentially be

6    $7 million to pay creditors, to be split up among these

7    various parties.  And the -- and then the assumption of

8    about $5 million in purchase orders, and then also the

9    assumption of obligations under our deductibles on our

10   insurance policies.  So we have cash on the one side and

11   we have the pool of creditors shrinking through assumption

12   of executory contracts.  And it has been the view of the

13   creditors that -- and I'll let the Creditors' Committee

14   speak for themselves, but it's about a $450,000 reduction

15   in the purchase price if we slip beyond July 31.

16        THE COURT:  Well, but I guess I don't follow

17   why.  Normally, you would prorate insurance.  So, why

18   isn't there a proration for --

19        MR. ROBERTS:  It's not the -- it's the liability

20   insurance.  Because we sell aircraft parts, we have an

21   unusual type of insurance policy.  Actually, as you may

22   recall, all but one of the plaintiffs have now waived

23   their claims under the insurance policies.

24        THE COURT:  Right.

25        MR. ROBERTS:  However, we have an obligation to

1   pay professional fees under our $350,000 deductible, with

2   an $875,000 aggregate.  There is an ability to buy a

3   policy, by a purchaser, to buy a policy to reduce that

4   obligation by paying a premium.  Based upon our pushing

5   forward, the Court has lifted the stay for these

6   plaintiffs' personal injury cases; but that stay is

7   lifting in mid-July.

8                  THE COURT:  Right.

9            MR. ROBERTS:  So, at that point forward, there

10  needs to be payment for the cost of the defense of those

11  suits going forward.  And the buyer has to be in place to,

12  within a short period after that, to pick up the

13  obligation under the plan, or buy insurance to pick up the

14  obligation, so that there is no prejudice to go forward --

15  going forward in the litigation.

16               I didn't explain that too well, but we have a

17  very -- it's a very small group of underwriters.  They're

18  not very happy that we probably have the legal right to

19  consider them to be an unsecured claim and not pay those

20  legal fees.  But imagine being the buyer of this company

21  who has done that to your insurance companies, trying to

22  get insurance.  So that's been -- I think this has been

23  brought to your attention more opaquely, I think, a few

24  times.  We are trying to run quickly, because of the

25  deterioration of the company, the insurance premium we're

1  going to have to pay in the future.  And quite frankly,

2  the insurance company is trying to preserve a relationship

3  with the insurance companies that they will provide

4  insurance going forward.

5          THE COURT:  But I'm missing July 30 --

6          MR. ROBERTS:  July 31 is the -- the actual date

7  is, we can stop carrying insurance once this plan is

8  confirmed, but we will not have to pay the $450,000

9  premium.  I guess that's the simplest way of saying it.

10          THE COURT:  Well, but why can't you prorate the

11  premium?  So, if the plan is confirmed August 10th, why

12  isn't all that you're liable for, ten days of a premium

13  into August?

14          MR. ROBERTS:  Well, we could ask the purchasers

15  to adjust the price, but the purchasers have not -- that

16  has not been a part of their offer at this point.  Their

17  offer -- every purchaser who has come to us has says,

18  "Look, as part of this condition, we will pick up your

19  deductible."  They have negotiated with insurance

20  companies.  I don't think I'm at liberty to go too far

21  down that road, but I can tell you, the insurance

22  companies' premium quote is not the same, and may not be

23  the same going forward unless they take care of going

24  backward.  And with the stay lifting, frankly, because we

25  all thought we would be going faster than this, we're now

1  getting into the situation.

2        THE COURT:  Well, but that's happening -- that's

3  happening as of July 15th, as I recall.

4        MR. ROBERTS:  Yes, but two weeks in state court

5  and discovery requests, it's not going to be -- you know,

6  you get out to three, four, five weeks, and that would

7  start getting to more difficulty.  So, that's the issues

8  in the case.  It's the insurance --

9        THE COURT:  So, can you not -- can you not get

10  those parties to agree to extend the time for the stay to

11  lift?

12        MR. ROBERTS:  If I'm not given the relief I am

13  asking for today, I don't know what other choice I have,

14  other than it being an adjustment to the purchase price,

15  or the purchasers quite simply saying, "Okay, so it's

16  less.  I'm still the high bid."

17        THE COURT:  Yeah.

18        MR. ROBERTS:  I think that's just as likely a

19  scenario, is, if I'm the high bidder, what do I care

20  whether it's less to these creditors?

21        THE COURT:  Yeah, but -- and we're just talking

22  now.

23        MR. ROBERTS:  Yes.

24        THE COURT:  Because obviously, there's not a

25  motion in front of me and -- but creditors need some time

1   to decide how they want to vote on this plan.  And the

2   fact that the Committee is on board, while that often is

3   very persuasive to creditors, doesn't mean that creditors

4   aren't the ones who are entitled to vote and don't need a

5   reasonable opportunity to participate, because, again,

6   once we're at the voting stage, we're now talking about

7   people who may not have been participating in this case at

8   all.

9            MR. ROBERTS:  Yes, Your Honor, and I understand,

10  in theory, exactly where you were.  If I was in here

11  filing a motion to expedite the plan, I would then have a

12  full set of facts for you.

13           THE COURT:  Well, but you are going to be

14  asking.

15           MR. ROBERTS:  Yes.

16           THE COURT:  I mean, I'm responding to your

17  request --

18           MR. ROBERTS:  No, I --

19           THE COUDRT:  -- to expedite the plan, to get to

20  confirmation prior to the end of July.

21           MR. ROBERTS:  Right.

22           THE COURT:  I just think that's --

23           MR. ROBERTS:  I'll be presenting facts that -- I

24  mean, I know you can't sit there and listen to my

25  representations about a disclosure statement or plan and

1  say, "My gosh, I would be for it," but that's essentially

2  not far off from -- if we are successful in the next 24

3  hours, we're going to be -- I'd be shocked if there's

4  anybody out there that would find a reason not to vote for

5  the plan, other than a competing bidder that might not be

6  happy about the process.  So --

7         THE COURT:  All right.  Well, I don't -- how

8  much time do you believe you're going to need for your

9  disclosure statement here?

10        MR. ROBERTS:  Again, Your Honor, I wouldn't

11 think it should take more than 15 or 20 minutes.  If there

12 is an objection, I can address it.

13               (call placed by Court to Court Clerk)

14        THE COURT:  All right.  I'm going to --

15        MR. ROBERTS:  I will disclose to the Court, we

16 will be filing an amended plan with a stalking horse

17 bidder.  As I've stood here, we just received an offer.

18 Just so you're aware of that.

19        THE COURT:  All right.  So, what does that mean

20 vis-a-vis the current disclosure statement?

21        MR. ROBERTS:  That means, instead of having,

22 we're going to sell to the highest and best -- or the

23 bidder, we're going to sell to the stalking horse, unless

24 at auction someone outbids them.  And then secondly, as to

25 the treatment among the creditors, the treatments will be

1  different.

2       THE COURT:  And so you'll have a specific bid

3  number?

4       MR. ROBERTS:  Yes, specific bid number and

5  specific assumption of purchase orders, specific on what

6  happens with the insurance policies.

7       THE COURT:  And is the amount creditors will

8  receive going up or down under the stalking horse bid?

9       MR. ROBERTS:  Well, since there was no stalking

10  horse, we wouldn't know what we would have gotten; but it

11  is -- well, so, the answer is, it's going up as far as --

12  well, I don't know how else to answer that, since the

13  original plan did not have a stalking horse.

14       THE COURT:  So there was no estimate of recovery

15  to creditors in the original disclose -- the current

16  disclosure statement?

17       MR. ROBERTS:  There was a liquidation value in

18  there, but there wasn't one.  In fact, the original one

19  said, if we don't get offers equal liquidation value,

20  we'll just throw this into our creditors' trust and

21  liquidate it.  So, if anything, we have specificity.

22  We're able to give them numbers and estimates of recovery,

23  and more importantly, as you might expect, most of our

24  creditors are our suppliers.  I don't know if I have told

25  you, but we assemble engines and parts.

 1              THE COURT:  Right.

 2              MR. ROBERTS:  From suppliers.  We're a mini-

 3   Chrysler when it comes to this.  We have a supply chain,

 4   so it would be very specific on the supply chain issue.

 5              THE COURT:  And when can you get that new

 6   disclosure statement and plan on file?

 7              MR. ROBERTS:  My partner is working on it today.

 8   I just have to circulate it to the Committee, since they

 9   are a co-proponent of the plan, and make sure it's okay.

10   So, I'm hopeful we can even get it done today; but, again,

11   I can't promise that, since Mr. Schuler is sitting in the

12   courtroom instead of reading what we've written.

13              THE COURT:  Well, assuming that you get it on

14   file by no later than 5:00 tomorrow, we will have a

15   disclosure statement hearing July 6th at 4:00 o'clock.

16              MR. ROBERTS:  Your Honor, I very much appreciate

17   it.  I understand the circumstances you're in, in trying

18   to rule on pleadings that aren't on file.  I appreciate

19   your hearing us out.

20              THE COURT:  So, if you don't get it on file,

21   then you're going to need to come back and we'll have a

22   further discussion about what we can do.  So, but assuming

23   that you get a new plan and disclosure statement on file

24   by that deadline, then we will -- I will shorten notice

25   such that we can go to disclosure statement hearing on the

1  6th at 4 o'clock.  But frankly, I probably won't require

2  written objections until noon on the 6th.

3        MR. ROBERTS:  That would be fine, Your Honor,

4  except for perhaps APS.

5        THE COURT:  So, to the extent, reach out to

6  people.  If you hear grumbling, reach out to folks,

7  because I will tell you that my docket is set fully that

8  day.  I'm putting you in at the end of the day in hopes

9  that some stuff in the afternoon falls apart.  But I'm

10 hopeful that you will be able, as you have pointed out,

11 disclosure statements shouldn't be big fights; so my hope

12 is, is that you will be able to cure -- if there are

13 objections, you'll be able to cure the issues with the

14 objecting party by more disclosure, so that we can move

15 through that relatively quickly.

16        MR. ROBERTS:  Yes, Your Honor.

17        THE COURT:  All right.

18        MR. ROBERTS:  Thank you.

19        THE COURT:  Thank you.  We're in recess.  You're

20 excused.  I'm going to be out here for a minute.  Thank

21 you.

22                    (Proceedings adjourned at 11:32 a.m.)

23

24

25

1

2        I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in

4   the above-entitled matter.

5

6   /s/Diane Lancaster _____              July 15, 2009
    Diane Lancaster                                   Date
7   Certified Transcriber

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25